UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

IN RE:      S&H SYSTEMS, INC.                    Case No. 3:26-bk-10365
                                                 Chapter 11

## MOTION TO COMPEL ASSUMPTION
## OR REJECTION OF EXECUTORY CONTRACT

Fidus Global, Inc. ("Fidus"), by and through its attorneys, Waddell, Cole & Jones, PLLC, and for its Motion to Compel Affirmation or Rejection of Executory Contract, states:

1.      The Debtor, S&H Systems, Inc. ("S&H"), filed its voluntary Chapter 11 bankruptcy petition on February 2, 2026.

2.      This motion is brought pursuant to 11 U.S.C. § 365(d)(2) and Federal Rule of Bankruptcy Procedure 6006. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A). This matter is a core proceeding, and the Court can enter a final judgment.

3.      In response to a request for proposals, on or about September 23, 2025, S&H made an offer to Fidus to provide certain services and equipment to Fidus in exchange for payment (the "Offer"). A copy of the Offer is attached hereto as "Exhibit A" and incorporated herein by reference.

4.      By its terms, the Offer was valid for thirty (30) days.

5.      Fidus accepted the Offer by issuance of a Purchase Order (the "PO") on October 6, 2025, a copy of which is attached hereto as "Exhibit B" (the Offer, as accepted by the PO, referred to herein as the "Contract") and timely made its first payment due to S&H under the Contract, equal to fifty percent (50%) of the total Contract price.

6.      The Contract constitutes an "Executory Contract" within the meaning of 11 U.S.C. § 365.

7.      The Contract provided that S&H was to oversee the implementation of a project, including engineering, procurement of hardware, and mechanical installation of hardware in partnership with Fidus. The Contract provides a schedule for S&H's performance under the contract beginning upon Fidus's issuance of the PO for specific items specified in the Contract.

8.      Pursuant to the terms of the Contract, S&H was obligated to begin installation of the equipment by February 9, 2026, with completion of the project by February 23, 2026.

9.      To date, installation of the equipment has not begun, and S&H is, therefore, in breach of the Contract. Upon information and belief, S&H has not obtained the equipment to be installed. Given the nature of the equipment to be installed under the contract, significant lead times in obtaining the equipment is expected.

10.     The Contract is a subcontract of work which is the subject of a prime contract between Fidus and a third-party. Delay in S&H's performance under the Contract threatens to place Fidus in breach of its obligations under its prime contract, resulting in loss to Fidus.

11.     Pursuant to 11 U.S.C. § 365(d)(2), this court may, on the request of any party to such contract or lease, order the debtor in possession to determine within a specified period of time whether they will assume or reject the contract.

12.     Fidus hereby requests that the Court issue an Order requiring S&H to assume or reject the Contract within five (5) days from the entry of such Order. Fidus also requests that the Court's

order provide in the event S&H fails to assume or reject the Contract within the specified time period the Contract be deemed rejected.

13.    Fidus further requests that S&H be allowed to assume the Contract only upon provision of adequate assurance to Fidus of its ability to fully and timely perform its remaining obligations under the contract and compensate Fidus for any and all loss relating to S&H's nonmonetary default under the Contract pursuant to 11 U.S.C. § 365(b)(1).

14.    Irreparable harm, loss and damage could result to Fidus unless immediate relief is granted. Thus, Fidus requests that this Motion be set for hearing at the Court's earliest convenience.

WHEREFORE, Fidus Global, LLC prays that the Court find and declare that (1) Debtor immediately notify Fidus of its election to assume or reject the Contract; (2) in the event that Debtor elects to assume the Contract, require Debtor to provide adequate assurance to Fidus of its ability to perform under the Contract; and (3) for all other relief that it may be entitled.

> Bradley J. Isbell (2022164)
> WADDELL, COLE & JONES, PLLC
> P.O. Box Box 1700
> Jonesboro, AR 72403
> (870) 931-1700
> bisbell@wcjfirm.com
>
>
> By: _/s/ Bradley J. Isbell_____
>     Attorneys for Fidus Global, LLC

## <u>CERTIFICATE OF SERVICE</u>

I, Bradley Isbell, do hereby certify that the foregoing pleading has been served on and will be delivered to all electronic case filing system participating parties via the Court's ECF noticing systems and provided to the following counsel of record, via U.S. Mail or electronically, this 27th day of February, 2026.

Kevin P. Keech
Keech Law Firm, P.A.
P. O. Box 194
Amity, AR 71921

U.S. Trustee
Office Of U. S. Trustee
200 W Capitol, Ste. 1200
Little Rock, AR 72201

*/s/ Bradley J. Isbell*
Bradley J. Isbell

F:\USERS\BJI\Fidus Global\S&H Systems Bankruptcy\Pleadings - Draft\Motion to Compel Affirmation or Rejection.wpd



September 23, 2025

Josh Larsen
Fidus Global
PO Box 1414
Paragould, AR 72451

      **Re:**    *JCP Throw-On Conveyor Line*

Dear Josh,

In response to your Request for Proposal (RFP) for new Conveyor hardware and S&H mechanical Installation Services for the JCP Distribution center located in Forest Park, GA.

    As we understand the challenges:
- Fidus is seeking a conveyor solution consisting of engineering, procuring, and installing a new slapper line.
- All Electrical & Controls scope will be provided by Fidus.

    Our intentions to address these challenges:
- Daifuku Conveyor
- S&H Project Management
- S&H Mechanical Installation
- S&H Mechanical Engineering

On behalf of the entire S&H Systems Team, thank you for your consideration of allowing us to participate in this extremely important initiative for Fidus Global.

Respectfully submitted,

S&H Systems, Inc.

Austin Hildebrant
Sr. Account Manager
ahildebrant@shsystems.com
1(937)763-6765



EXHIBIT

A

©S&H Systems, Inc.

This document and the information contained herein, including exhibits, are confidential and proprietary to S&H Systems ("S&H"). It is not to be disclosed to competitors, third parties, vendors, or others without the prior written consent of an officer of S&H Systems.



## 1.    Proposed Investment

| Item | Price |
|---|---|
| *Base Project Description* | |
| Daifuku Conveyor & Mechanical Hardware | $117,909 |
| Mechanical Installation | $90,994 |
| Mechanical Engineering | $19,396 |
| Project Management | $16,800 |
| *Total Investment* | *$245,099* |
| *Estimates* | |
| Freight | $4,250 |
| Spare Parts | $10,000 |
| Taxes | $22,000 |

**Pricing Note:**
Pricing is based on the information contained in this Proposal, including any Client provided documentation referenced herein, product and service offerings, and our standard terms and conditions or other mutually agreed to terms as referenced within the Proposal. New or additional equipment, services, performance requirements, or obligations in the terms and conditions may affect scope, scheduling and/or pricing for this project.

1.  Price does not include cost of freight.  Freight will be invoiced via separate invoice for reimbursement (freight pre-pay and add).  Unless expressly stated otherwise in the proposal, any freight estimates contained within this proposal are provided for informational use only and such freight estimates are not included in the proposed fixed price.

2.  **Taxes/Tariffs:** The Total Investment Price does not include federal, state, county, municipal tax, sales or use tax, or any other tax, fines, assessments, penalties, import or export duties, tariffs, or customs charges (collectively "Tax(es)").  If an amount is listed for "Estimated Taxes" above, such amount may or may not reflect the actual final sales tax owed and is provided for informational use only.  The taxability of items and the applicable tax rates are calculated with information available as of the date of each invoice.  This information may change without notice.  If Client is claiming an exemption from any Tax, Client must provide a valid exemption certificate.  Regardless, client remains responsible at all times for all Taxes owed under this project.

   Tariffs if imposed based on the current market will be discussed between (Client) and S&H. Should any impact be determined by (Client) and/or S&H, we reserve the right to change suppliers as part of a collaborative mitigation strategy.



3.  Due to volatility in labor and commodities, the above stated pricing is valid for thirty **(30) days** from date of this proposal.

4.  The pricing breakdowns listed above are for accounting purposes only and should not be considered as stand-alone prices.

## 2.    Document Control

| Version Number | Version Date | Summary of Changes |
|---|---|---|
| 0 | 5/20/2025 | Original Hytrol ROM Proposal |
| 1 | 6/20/2025 | Daifuku Firm Revision |
| 2 | 7/17/2025 | Removed Straight Run Slapper Conveyor |
| 3 | 9/23/2025 | Adjusted Milestone Payment Terms |



## 3. Table of Contents

1.  Proposed Investment ................................................................................................2

2.  Document Control ...................................................................................................3

3. Table of Contents ...................................................................................................4

4. Design Criteria .......................................................................................................5

5. Scope of Work.........................................................................................................7

6. Responsibilities.......................................................................................................9

7. Project Schedule ...................................................................................................13

8. Invoicing Schedule................................................................................................13

9. Support Services ...................................................................................................14

10. Agreement...........................................................................................................15

11. Terms & Conditions.............................................................................................16



# 4. Design Criteria

## 4.1    References & Standards
### 4.1.1    Industry Standards & References
- Occupational Safety and Health Administration (OSHA) Standard 1926.555, Conveyors
- Occupational Safety and Health Administration (OSHA) Standard 1917.48, Conveyors
- American National Standards Institute (ANSI) B20.1-1957 Safety Code for Conveyors, Cableways and Related Equipment
- Underwrite Labs (UL) 508A Standard for Industrial Control Panels Intended for General Use

## 4.2    Material To Be Handled (MTBH)
The equipment, arrangement, and operational plan outlined in this proposal are tailored to accommodate the unique attributes of the product to be conveyed by Fidus Global. The product's key characteristics are detailed below. Any modifications to these attributes may impact the proposed layout, timeline, cost, and technical capabilities presented in this proposal:

| Product | Length (in) | Width (in) |
|---|---|---|
| Packages | | |
| Minimum | 6 | 4 |
| Maximum | 26 | 19 |

## 4.3    Additional Design Requirements

### 4.3.1    Product Conveyability
To ensure consistent and efficient conveyance of the aforementioned products, all items must have a sturdy, dry, and flat sealed bottom suitable for conveyance. Products should be free of any loose or reflective packaging materials, and all flaps or lids must be securely closed and fastened. When placing items on conveyors, orient the product's longest dimension in the direction of travel to maintain stability and prevent top-heavy loads.

Maximum length and width of items to be handled are interdependent. In a typical system, an item with both the maximum width and length may not successfully traverse curves within the system



### 4.3.2   Exceptions or Exclusions

The following exclusion(s) to the requested scope of work are noted below:

- Fidus Global is responsible for all electrical & controls engineering, hardware, installation & commissioning requirements.
- WMS, WES & WCS are excluded
- Building utility modifications
- All waste handling
- PIT Equipment (fork Trucks, pallet jacks, carts, etc)
- Building permits, occupancy permits and conveyor permits
- Taxes
- Freight



## 5. Scope of Work

### 5.1    Overview

- Project Implementation (By Site)
  - Firm Engineering
    - Develop the system mechanical layout drawings in partnership with Fidus Global
    - Develop the Description of Operations document in partnership with Fidus Global

  - Equipment Ordering, Manufacturing and Assembly
    - Specify and submit purchase orders for mechanical and electrical equipment to the appropriate vendors.
    - Monitor lead times as well as plan and coordinate shipment and deliveries to site.

  - Premobilization
    - Develop the mechanical installation drawing sets.
    - Engineering turnover to project team
    - Project team site onboarding to the project site
    - Mobilization
    - Receive and set up the project team trailer & dunnage container.
    - Receive equipment deliveries, inventory, and stage.

  - Installation
    - Mechanical Installation



### 5.3   Description of Operations

Associates will place packages on Customer provided Dematic transportation conveyor at 30 inch elevation, conveying the product into the new Daifuku roller curve that will transfer into a new Daifuku belted incline. From there the package will flow back onto new Daifuku accumulation conveyor into a new Daifuku V-belt curve. After the V-belt curve, the product will transition onto new Daifuku narrow belt accumulation conveyor onto a new 9-foot Daifuku break belt before transferring to an existing saw tooth merge.





- As part of this revision, S&H has removed conveyor hardware costs for the straight run of slapper line conveyor. The new Daifuku conveyor will begin at the first 90 degree curve.



## 6. Responsibilities

The following table outlines the various services required for successful implementation of this project and the responsible party to accomplish such services:

| Description of Services | Responsible Party | |
|---|---|---|
| | Customer | S&H |
| *General and Administrative* | | |
| Project team organizational chart and responsibilities including contact information. | ☐ | ✓ |
| Project Manager, including project administration for providing the scope of work described herein. | ☐ | ✓ |
| Site Manager/Coordinator for supervising the daily tasks and coordination efforts required for providing the scope of work described herein. | ☐ | ✓ |
| Permitting fees, including fees associated with PE stamped drawings, permit applications, plans reviews, permit issuance, notices & inspections, including third party inspections. | ✓ | ☐ |
| Taxes including sales tax. | ✓ | ☐ |
| Freight, FOB Origin, Prepaid | ✓ | ☐ |
| *Facility* | | |
| 480V, 3-Phase, 60 Hz Clean and stable power from the facility's Main Switchboard/Switchgear to the Main Distribution Panels or our Motor Control Panels using permanently connected utility-provided source of electrical power and not temporary generator-provided sources | ✓ | ☐ |
| 480V/120V Transformers (Specifically for MHE System Workstation Receptacles as Described in Section 14.2 Herein): Equipment design, supply & electrical install. | ✓ | ☐ |
| 480V/120V Transformers (Other Than MHE System Workstation Receptacles as Described in Section 14.2 Herein): Equipment design, supply & electrical install. | ✓ | ☐ |
| 120V Receptacles (Specifically for MHE System Workstations as Described in Section 14.2 Herein): Equipment design, supply & electrical install. | ✓ | ☐ |
| 120V Receptacles (Other Than MHE System Workstations as Described in Section 14.2 Herein): Equipment design, supply & electrical install. | ✓ | ☐ |
| Lighting (Other Than Under S&H-Provided Platforms): Equipment design, supply & electrical install. | ✓ | ☐ |
| Lighting (Under S&H-Provided Platforms): Equipment design, supply & electrical install. | ✓ | ☐ |
| Fire Alarm and Emergency Lighting: Equipment design, supply, mechanical & electrical install (including power), controls integration. | ✓ | ☐ |
| Fire Suppression System: Equipment design, supply & mechanical install. | ✓ | ☐ |
| Infrastructure outside the building, such as parallel roads, fencing, etc., including general security of the location. | ✓ | ☐ |

| Description of Services | Responsible Party | |
|---|---|---|
| | Customer | S&H |
| Available sufficient parking facilities at the site location. | ✔ | ☐ |
| Personnel access to all parts of the installation included in the scope of work described herein during all phases of the project, even outside normal working hours if necessary. | ✔ | ☐ |
| Available location for office trailer on site either in trailer yard or at a dock door location. | ✔ | ☐ |
| Office trailer for project team. | ☐ | ✔ |
| Floor capable of supporting equipment loads. Design and install footers if necessary. | ✔ | ☐ |
| Adequate ceiling and bar joist structural capacity to support equipment from overhead. Make necessary structural reinforcement of ceiling or bar joists as required. | ✔ | ☐ |
| Adequate source of compressed air (clean and dry) to meet system specification. Air source to be provided within 50' of designated location(s). Specification to be determined during firm engineering. | ✔ | ☐ |
| Egress & life safety requirements including exit signs, emergency lighting or building modifications to accommodate additional egress paths. | ✔ | ☐ |
| Provide a clear path for the ingress to and egress from the installation site project team personnel. | ✔ | ☐ |
| Maintain the facility in a watertight condition and free of debris or obstruction. | ✔ | ☐ |
| Access to the facility with adequate lighting and sanitary facilities available during working hours. | ✔ | ☐ |
| Adequate equipment and tool staging area throughout project duration. | ✔ | ☐ |
| Any site clearance relocation of non-material equipment or supplies if required to facilitate an orderly installation schedule. | ✔ | ☐ |
| Removal of any structures in the path, i.e. building offices, piping, conduit, etc.… | ✔ | ☐ |
| Disposal container(s) for dunnage from new equipment. | ✔ | ☐ |
| *Equipment* | | |
| Conveyor: Equipment design, supply, mechanical install. JCP will provide their own Dematic conveyor hardware needed for the straight run of slapper line conveyor. S&H will provide new conveyor starting at the first 90 degree curve. | ✔ | ✔ |
| Totes: Equipment supply. | ✔ | ☐ |
| RF Handheld Scanners: Equipment supply. | ✔ | ☐ |
| Powered Industrial Trucks (Forklifts, VNA Order Pickers, Reach Trucks, etc.…), charging stations: Equipment supply. | ✔ | ☐ |
| Wire Guidance for VNA Order Pickers: Equipment design, supply & mechanically install. | ✔ | ☐ |

**S&H**
SYSTEMS

| Description of Services | Responsible Party | |
|---|---|---|
| | Customer | S&H |
| Highway Railing & Safety Bollards: Equipment design, supply & mechanical install | ✓ | ☐ |
| 5S Signage & Floor Tape: Equipment design, supply & mechanical install | ✓ | ☐ |
| End of Aisle Dome Mirrors: Equipment design, supply & mechanical install | ✓ | ☐ |
| Inventory Location Labels: Equipment design, supply & mechanical install | ✓ | ☐ |
| Lock-Out/Tag-Out Placards/Stickers: Equipment design, supply & mechanical install | ✓ | ☐ |
| Arc Flash Labels: Equipment design, supply & mechanical install | ✓ | ☐ |
| Main Distribution Frame (MDF) Data Network Cabinets: Equipment design, supply & mechanical & electrical install (including power) | ✓ | ☐ |
| Intermediate Distribution Frame (IDF) Data Network Cabinets: Equipment design, supply & mechanical & electrical install (including power) | ✓ | ☐ |
| *Mechanical Installation* | | |
| Non-union mechanical installation of equipment described herein by qualified installers with proper tools and equipment. Installation to be done during normal business hours Monday through Friday, 7:00 a.m. until 5:00 p.m. | ☐ | ✓ |
| Mechanical installation supervisor to assist and manage personnel for the mechanical installation of the equipment described herein. | ☐ | ✓ |
| Provide specialized tools required such as hammer drills, belt lacer, belt welder, etc. for the proper mechanical installation of the equipment described herein | ☐ | ✓ |
| Forklift or other mobile lifting and erecting equipment used in support of the mechanical installation of the equipment described herein. | ✓ | ☐ |
| Provide necessary access roads, dock areas suitable for receiving and unloading the mechanical equipment described herein. | ✓ | ☐ |
| Fire protection for any hot work required for the proper mechanical installation of the equipment described herein. | ✓ | ☐ |
| Power tool electric supply 110/220VAC, sufficient to supply entire area for hand tools for the mechanical installation of the equipment described herein. | ✓ | ☐ |
| Provide secure, dry, convenient storage for mechanical equipment, tools and materials used on the site as well as adequate workspace for the mechanical installation crews. | ✓ | ☐ |
| Refurbishment or removal of existing equipment not specifically described herein. | ✓ | ☐ |
| Trash and dunnage removal from new equipment to disposal container(s). | ✓ | ☐ |
| Cleanup of area upon completion. | ☐ | ✓ |

| Description of Services | Responsible Party | |
|---|---|---|
| | Customer | S&H |
| *Testing and Commissioning* | | |
| Fully functional Host system for testing purposes. Data network to Host system installed and be in full working order prior to the start of the commissioning process. | ✓ | ☐ |
| For the commissioning of the HOST interface, authorized personnel from every communication layer of the Host system available during testing of the interface. | ✓ | ☐ |
| Submit for approval of a detailed test plan and documentation, including detailed conditions for the tests. | ✓ | ☐ |
| Comment and approve the detailed test plan within two weeks of submission. | ✓ | ☐ |
| Providing the correct environment for carrying out system tests during the acceptance tests. | ✓ | ☐ |
| Reporting the readiness for testing after completion, two weeks before the agreed date. | ✓ | ☐ |
| Third party certification tests (i.e. local weights & measures authority). | ✓ | ☐ |
| Operations and maintenance training. Four training sessions to be scheduled on mutually agreed upon dates and times. | ✓ | ☐ |
| Operations and maintenance personnel available during the training sessions | ✓ | ☐ |
| Startup supervision and debugging of system. See Section 14.1 for Startup support details. | ✓ | ☐ |
| Adequate supply of test product available for system testing and debug. | ✓ | ☐ |
| *Post Launch* | | |
| Startup support and supervision for system during initial operation. | ✓ | ☐ |
| Warranty claim procedures. | ☐ | ✓ |
| Final documentation, including as-built drawings, maintenance manuals and operating procedures. | ☐ | ✓ |
| 24/7 Hotline support service with 10-minute response time. | ☐ | ✓ |
| Operation and maintenance of the system. | ✓ | ☐ |



## 7. Project Schedule

| Milestone | Duration |
|---|---|
| *Project Implementation* | |
| PO Issued by Fidus | TBD |
| Project Kick Off Meeting | PO + 3 days |
| Firm Engineering Start | PO + 1 weeks |
| Firm Engineering Complete | PO + 6 weeks |
| Start of Installation | PO + 18 weeks |
| Completion of Installation | PO + 20 weeks |
| Fidus acceptance | PO + 22 weeks |

## 8. Invoicing Schedule

| Invoice # | Invoice Percentage of Contract Phase | Invoicing Milestone Description |
|---|---|---|
| 1 | 50% | Downpayment to kick off Engineering and order hardware – Due Net 30 |
| 2 | 25% | Delivery of Conveyor to JCP Distribution Center – Due Net 45 |
| 3 | 20% | Completion of Mechanical Installation – Due Net 45 |
| 4 | 5% | Fidus Final Acceptance – Due Net 45 |



## 9. Support Services

### 9.1    Help Desk Support

After the start-up support period has passed and customer has assumed full-time operations and maintenance duties of the material handling system, there may be instances where technical support is needed.  Those instances could occur at any time of any day therefore, S&H offers unlimited access to a 24-hour technical support line during the system's warranty period. An extension of this service beyond the warranty period is available for purchase. This support service provides resources required for effective remote troubleshooting and issue resolution, including access to Controls Engineers and Mechanical Technicians. Should these front-line resources be unable to address the issue properly and in a timely manner, S&H uses an escalation path process that is designed to quickly identify and dispatch the appropriate resources.

## 24 Hour Technical Support Line: (870) 738-8147

| Escalation Paths |
| --- |
| Support Services Escalation Path 1 |
| Electrical/Controls Program Manager |
| Mechanical Program Manager |
| Support Services Escalation Path 2 |
| Director of Controls Engineering |
| Director, Customer Service |

### 9.2    Warranty

S&H Systems guarantees those goods sold by S&H Systems and/or our suppliers will be free from defects in material and workmanship for a period of one year from the beneficial use date.  S&H Systems' sole obligation under this warranty shall be to repair or replace any part or goods proving defective within the terms and period of this warranty. Buyer must provide S&H Systems with immediate written notice of the claimed defect, including a description of the goods, the defect, serial number, and the date of its discovery. S&H Systems and/or our supplier(s) reserves the right to inspect the part or goods at the buyer's location. Buyer shall bear responsibility for the cost of labor, freight, and other charges for the removal of defective parts or goods and installation of the replacement part or goods.

S&H Systems' *warranty* obligation does not extend to failure or damage due to abuse, neglect, accident, improper repair, maintenance, installation or adjustment, exposure to corrosive or abrasive material, operation under any degree of dampness, or alteration or modification by persons other than S&H Systems or the original part manufacturer. If part does not meet the warranty requirements the Buyer will be invoiced for all charges incurred for the replacement part.

*S&H Systems makes no warranties, either express or implied, which extend beyond the beneficial use date. S&H Systems shall not be liable for failure of the goods to comply with federal, state, or local laws, or for incidental or consequential damages.*



## 10. Agreement

Except as otherwise provided in this SOW the terms of the agreement, including all exhibits, documents expressly incorporated by reference, and all subsequent SOWs that remain in effect, apply to this SOW.

In case of any conflict between the terms of the Agreement and the terms of this SOW the terms of this SOW control as to the MMS Services only.

For good and valuable consideration, the nature and adequacy of which is hereby acknowledged, the Parties agree this SOW is effective as of the effective date.

**S&H Proposal Number:** 00433A

|  | **Accept** | **Reject** |
|---|:---:|:---:|
| Base Solution | ☐ | ☐ |

**Fidus Global**                                           **S&H Systems, Inc.**

Signature: _____          Signature: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____



## 11. Terms & Conditions

### Exhibit – Standard Terms and Conditions

1.   **APPLICABILITY**. These Standard Terms and Conditions (these "Terms") are an Exhibit to the Sales Agreement (the "Agreement") and are hereby incorporated as if fully set forth therein.  These terms apply to all Goods and Buyout Items sold by, and all Services provided by Seller to Buyer. All capitalized terms used shall have the meanings ascribed to them in the Agreement or Seller's Proposal. Unless otherwise defined in Seller's Proposal or the Agreement: "Goods" shall mean the machinery, equipment and hardware manufactured, or assembled, or procured by Seller that is intended to be permanently installed at the Worksite; "Buyout Items" shall mean third-party equipment or machinery furnished in connection with the Work which are not integral to or made part of the Goods; and "Services" shall mean the professional services, all as set forth under Seller's Proposal, attached hereto. Goods, Buyout Items and Services may be collectively referred to hereunder as "Work". The amount of the "Purchase Price" shall be as set forth in the Agreement. The term "Worksite" shall mean the location where the Goods and Buyout Items shall be installed or delivered, as set forth in Seller's Proposal. These Terms prevail over any of Buyer's general terms and conditions of purchase regardless of whether or when Buyer has submitted its purchase order or such terms, and such Buyer terms shall be void and of no effect. Notwithstanding anything herein to the contrary, to the extent any provision of these Terms is inconsistent with terms in the Agreement or Seller's Proposal, the terms of the Agreement or Seller's Proposal shall prevail.

2.   **TAXES**. Unless otherwise specified under Seller's Proposal, the Purchase Price (as set forth in the Agreement) does not include any taxes, import or export duties, tariffs, or customs charges. The Buyer agrees to promptly pay or reimburse Seller the amount of any federal, state, county, municipal or other taxes, duties, fines, tariffs, or customs charges levied.

3.   **PRICE AND PAYMENT**. Unless otherwise specified under Seller's Proposal, the Purchase Price shall be paid by Buyer as follows:

   a.   50 percent of the Purchase Price upon Buyer's authorization to proceed or execution of the Agreement ("Down Payment");

   b.   45 percent of the Purchase Price shall be paid to Seller in the form of monthly progress payments/or payment milestones as described in the scope of work or proposal for Work performed. Progress payments shall be made by the Buyer until the progress payments and Down Payment together total 95 percent of the Purchase Price; and

   c.   5 percent of the Purchase Price may be held as retainer. Buyer will pay the retainer within 30 days after completion of Work ("Final Acceptance") unless Buyer notifies Seller of any deficiencies prior to Final Acceptance. The retainer will be reduced as necessary to correct the claimed deficiencies and Buyer will pay down the retainer in the determined amount. Seller shall invoice the remaining balance upon Final Acceptance.

   d.   Payment may be made via electronic transfer. Payment under 3.a shall be made Net 10 days after Buyer's receipt of Seller's invoice. Payments under 3.b and 3.c above shall be made Net 30 days after Buyer's receipt of Seller's invoice. Buyer shall not withhold payment of any amounts due and payable by reason of any set-off of any claim or dispute with Seller or other deduction.

   e.   Buyer shall notify Seller in writing of any dispute with any invoice (along with substantiating documentation) within 10 days from the date of such invoice. Buyer will be deemed to have accepted all invoices for which Seller does not receive timely notification of disputes.

   f.   Late payments shall accrue a finance charge of one and one-half percent (1.5%) per month or the highest rate allowable by law, whichever is less. Seller shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, arising out of Buyer's failure to make all payments due in a timely manner.

4.   **PURCHASE MONEY SECURITY INTEREST**. Buyer hereby grants Seller a security interest in all Goods and Buyout Items purchased hereunder and the proceeds therefrom to secure Buyer's payment obligations hereunder. Buyer acknowledges that the security interest granted under this Section is a purchase money security interest under applicable law. Seller may file a financing statement for such security interest and Buyer shall execute any such statements or other documentation necessary to perfect Seller's security interest in such Goods and Buyout Items.

5.   **INSTALLATION OF GOODS AND BUYOUT ITEMS**. If and to the extent specified under Seller's Proposal, Seller will install the Goods and Buyout Items at the Worksite, Seller will obtain on Buyer's behalf any documents, permits, or approvals required by law or regulation required for the installation, all as set forth under Seller's Proposal. Seller shall separately invoice Buyer for its direct costs (e.g., permit fees and charges, third-party professional services, unanticipated support required) incurred in complying with the immediately preceding sentence, excepting routine costs of Seller's labor to procure such documents, permits or approval, which routine costs are included in the Purchase Price.

6.   **DELIVERY AND ACCEPTANCE**.

   a.   Delivery of Goods and Buyout Items shall be F.O.B. origin, or as otherwise expressly stated in Seller's Proposal. Subject to the other provisions of these Terms, title and risk of loss with respect to Goods and Buyout Items ordered passes to Buyer upon delivery. Any time quoted for delivery is an estimate only and Seller shall use commercially reasonable efforts to supply Goods and Buyout Items in accordance with the delivery periods or times agreed to in writing.

   b.   "Final Acceptance" shall be based upon acceptance tests performed by Seller at the Worksite illustrating conformance to specifications set forth in Seller's Proposal or, alternatively, Final Acceptance shall be upon Beneficial Use by the Buyer. "Beneficial Use" as used herein shall mean the first commercial use by Buyer or its designated representatives of the Goods installed at the Worksite prior to Seller completion of acceptance tests (for purposes of this definition, including, if applicable, vendor or third-party manufactured equipment delivered and/or installed by Seller as set forth in Seller's Proposal). Whenever the installation of any portion of the Goods has been completed by Seller, Seller may make available such portion for Buyer's use, provided, however, that the parties mutually agree as to the terms and conditions of such use. Except as otherwise agreed by Seller, such use shall not interfere with the installation of the remainder of the Goods.



Seller shall not be liable for the cost of repairs, rework or replacement which may be required due to ordinary wear and tear resulting from such use.

7. **DESCRIPTIVE LITERATURE**. Drawings, descriptive matter, weights and dimensions submitted with Seller's Proposal as well as all information expressed or implied in Seller's catalog, website, price sheets, training material, previous conversations, or other communications are intended to reflect the general features of the Goods and do not form a part of these Terms or the Agreement.

8. **CONFIDENTIALITY AND PROPRIETARY RIGHTS**. During the course of the Agreement, either party may have or may be provided access to the other's confidential information and materials. Confidential information is all non-public, confidential or proprietary information, including, but not limited to, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing, and marketing. If Seller and Buyer have entered into a separate written agreement governing the use and control of each party's confidential information, such written agreement shall control. If the parties have not entered into such separate written agreement, then each party hereby agrees to maintain such information in confidence and to limit disclosure and use of such information to the extent necessary for the parties hereto to carry out their respective obligations set forth in the Agreement. Each party hereto agrees to take all reasonable precautions to treat such information as it treats its own confidential and proprietary information, but in no event less than reasonable care. Buyer agrees to restrict access to the Goods only to its personnel and third party contractors servicing the Goods for its intended purposes.

9. **S&H SOFTWARE, PLC, THIRD-PARTY SOFTWARE**.

   a. "S&H Software" means proprietary Seller software including Programmable Logic Controller (PLC) code and other Seller computer software, programs, programmable logic, operating systems or object code running with or embedded in equipment manufactured or procured by Seller and related documentation of Seller. "Third-Party Software" means third-party machine control software, third-party warehouse control software, third-party warehouse execution software, or other third-party computer software programs, programmable logic, operating systems or object code running with or embedded in equipment manufactured by the third-party and related documentation. If the Work includes Seller furnishing S&H Software and/or Third-Party Software then the following license terms apply:

      i. Subject to the terms of the Agreement, Seller hereby grants to Buyer a nontransferable, nonexclusive, single site license to use S&H Software in connection with Buyer's own use of the Goods and Buyout Items. Notwithstanding any contrary provision in the Agreement, Seller shall retain all right, title and interest in and to S&H Software licensed to Buyer hereunder.

      ii. Buyer agrees to maintain the confidentiality of S&H Software and to instruct and obligate its employees and agents to do the same. Without limiting the generality of the foregoing, Buyer shall not reproduce or modify all or any portion of S&H Software (excepting backup or archival copies), nor shall Buyer disclose, sell, sublicense or otherwise transfer or make available all or any portion of S&H Software to any third party, without the prior express written consent of Seller.

      iii. Buyer shall not modify, reverse engineer, copy, decompile or prepare derivative works of S&H Software. Notwithstanding the immediately preceding sentence, Buyer is granted the limited right and license to use and modify (and cause third parties to modify on behalf of Buyer (A) under the same licensing terms as set forth hereunder and (B) with the prior written consent of Seller), such source code for maintenance and support of S&H Software at all times at the Worksite ("Buyer Modification"). In the event of a Buyer Modification that has not been approved in writing by Seller or that is made without following the written instructions and direction of Seller, Buyer hereby agrees to discharge and release Seller from any and all claims including, without limitation, claims related to performance of S&H Software, warranty, damages, or infringement.

      iv. In addition to any other remedy Seller may have, Seller reserves the right to terminate Buyer's license if Buyer fails to comply with the terms or conditions of this license. Buyer agrees, upon notice from Seller of any termination of this license and in accordance with any more specific directions from Seller, to deliver immediately to Seller all software and copies thereof in the possession or custody of Buyer embodying S&H Software.

   b. If the Work includes Seller furnishing a PLC, Seller grants Buyer the right to access resident programmable memory developed to implement specific functions or instructions intended by Buyer. Such functionality as well the specific program language used and the operating systems supporting PLC's shall be as specified in Seller's Proposal. Certain subroutines and modules of PLCs may be password protected in order to safeguard confidential trade secrets and proprietary information of Seller.

   c. All license rights for Third-Party Software furnished by Seller in connection with the Goods shall be transferred and assigned to Buyer by Seller as Buyout Items and Buyer agrees to comply with the terms of the software license, warranty or other conditions of such third party.

10. **WARRANTY**.

   a. Goods. Unless otherwise specifically set forth in Seller's Proposal or the Agreement, Seller warrants to Buyer that, for a period of one (1) year from (i) the completion of delivery of the Goods provided that the Seller's installation is postponed due to a delay that is initiated by Buyer or (ii) the date of Final Acceptance, each item of Goods will be free from all liens, charges or encumbrances, except any lien of Seller in respect of any unpaid portion of the Purchase Price, will conform in all material respects to Seller's written specifications made part of the Agreement, and will be free from defects in materials and workmanship (such 1 year period hereinafter referred to as the "Warranty Period"). Notwithstanding the foregoing, Seller assumes no liability for any errors or omissions in any specifications provided or required by Buyer ("Buyer Specifications"), including any errors or omissions made by Seller in interpreting Buyer Specifications.

   b. Seller's obligation under this warranty for Goods is limited, at Seller's option, to repairing or replacing (labor excluded) at Seller's facility or at the Worksite, any Goods (or parts thereof) that do not conform to this warranty. Buyer shall promptly notify Seller in writing of any alleged defects in the Goods and specifically describe the defect. Seller shall have no



obligation under this warranty with respect to any defect unless it receives written notice and a description of such defect within the Warranty Period. Upon receipt of such notice, Seller shall either advise Buyer that the condition shall be remedied at Worksite or shall instruct Buyer as to the part or parts of the Goods that Buyer shall remove or cause to be removed pursuant to Seller's written instructions. Any nonconformity in S&H Software  may be remedied remotely. For Goods which Seller determines to have been defective, Seller will pay the costs of transporting repaired or replaced Goods back to Buyer and will reimburse Buyer for costs of transporting the defective Goods to Seller; otherwise, Buyer shall pay all costs of transportation in both directions.

c.   The foregoing warranties shall not apply to any Goods which have been: (i) used or operated in a manner inconsistent with a) the use intended by Seller or b) operating, preventive maintenance or other Seller instructions delivered hereunder; (ii) modified or repaired by anyone other than Seller personnel or Seller's authorized service representatives; (iii) the subject of normal wear and tear; or (iv) damaged because of accident, neglect or misuse, failure or surge of electrical power, air conditioning or humidity control, transportation, or causes other than ordinary use and operation.

d.   In the event of a Major Failure necessitating, in opinion of Buyer, immediate remedial action at the Worksite, Seller will provide the necessary labor and materials to correct the failure. "Major Failure" shall mean a condition that significantly impacts Buyer's ability to use the Goods or portion thereof and which maintenance personnel or available contractors cannot remedy, such condition may include repeated failures of an otherwise minor nature that cannot be remedied through the ordinary course of service within a reasonable period of time. Buyer agrees to reimburse Seller for the labor and expenses of the service trip if it the major failure is later determined at the sole discretion of Seller to be outside of Seller's warranty obligations.

e.   Services. Unless otherwise specifically set forth in Seller's Proposal or the Agreement, Seller warrants to Buyer that the Services shall: (i) be performed using personnel of required skill, experience and qualifications and in a professional manner, and (ii) be performed in compliance with all applicable laws, rules and regulations. Except as set forth in the immediately preceding sentence, Services provided hereunder are provided on an as-is, where is basis with no other warranty whatsoever.  Buyer shall notify Seller in writing during the two (2)week period commencing on completion of the Services (the "Services Warranty Period") of any alleged failure of the Services to conform to the Services Limited Warranty.  Any failure to properly and timely notify Seller hereunder within the Services Warranty Period of an alleged failure of the Services to conform to the Services Limited Warranty shall be deemed to be an acceptance by Buyer of the Services and a waiver by Buyer of any rights under such Services Limited Warranty.

f.   Buyout Items. To the extent contractually allowed, Seller transfers and assigns to Buyer all rights and benefits, if any, held by Seller under warranties and indemnities made or furnished by the manufacturers, suppliers or vendors of all equipment, machinery, products or other items procured by Seller and delivered to Buyer hereunder, For the avoidance of any doubt, Buyout Items include, but are not limited to, manufactured hardware, control panels, motors and reducers, taper assemblies, off the shelf computer hardware or software purchased directly at the Worksite, etc.

THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES, EXPRESS, IMPLIED,  ARISING BY OPERATION OF LAW, COURSE OF DEALING, USAGE OF TRADE OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT AND ANY WARRANTY OF FREEDOM FROM CLAIMS OF OTHERS BY WAY OF INFRINGEMENT OR THE LIKE, OR OTHERWISE.

11.   **DEFAULT; TERMINATION**.

a.   Failure to make any payment when due in accordance with the terms hereof shall constitute a default. Any other material breach of the Agreement by either party shall constitute a default if the defaulting party has not (i) cured its performance within 30 days after written notice of such breach is received, or (ii) within such 30 day period, presented the non-defaulting party with a reasonably acceptable plan to cure its performance. In all cases, either party may immediately terminate the Agreement upon written notice if the other party becomes insolvent or files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, makes or seeks to make a general assignment for the benefit of its creditors or applies for, or consents to, the appointment of a trustee, receiver or custodian for a substantial part of its property, or is generally unable to pay its debts as they become due.

b.   If the Agreement is terminated or cancelled by Buyer prior to the completion of performance by Seller hereunder (excluding any termination or cancellation for the material breach by Seller), Buyer shall as a condition of such cancellation or termination be obligated to pay Seller's reasonable costs and expenses incurred or committed to prior to the date of such termination or cancellation in respect of all work and services performed by Seller hereunder, plus a reasonable allowance in respect of Seller's anticipated margins  on such costs. Buyer agrees to pay such termination settlement within 30 days following receipt of Seller's invoice therefore, which shall be submitted to Buyer as soon as practicable after such termination or cancellation.

c.   Sections 2, 4, 8, 10 - 13, and 15 of these Terms and Conditions shall expressly survive termination or expiration of the Agreement, as well as other Sections of the Agreement that may be reasonably required to interpret the parties' respective obligations hereunder.

12.   **LIMITATION OF LIABILITY**. NEITHER SELLER NOR ITS REPRESENTATIVES, OFFICERS, AGENTS, EMPLOYEES, PRINCIPALS OR ASSIGNS, IN EACH CASE WHETHER CURRENT OR FORMER, IS OR SHALL BE LIABLE TO BUYER OR ANY THIRD PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST MARGINS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THESE TERMS AND CONDITIONS OR SELLER'S PERFORMANCE HEREUNDER, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED IN ADVANCE BY BUYER OR COULD HAVE BEEN REASONABLY FORESEEN, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE. SELLER'S AGGREGATE LIABILITY TO BUYER OR ANY THIRD PARTY ARISING OUT OF OR RELATED TO THESE TERMS, THE AGREEMENT, OR SELLER'S PROPOSAL, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, SHALL NOT EXCEED THE PURCHASE PRICE FOR THE SPECIFIC WORK GIVING RISE TO SUCH LIABILITY.

13.   **INDEMNIFICATION**.



a. Seller will, at its own expense, defend any suit or proceeding against Buyer in a court of the United States for the direct infringement of United States patents by the Goods purchased by Buyer hereunder. Seller shall pay all damages and costs finally awarded against Buyer because of direct patent infringement; provided, however, that Seller shall not be obligated to defend, indemnify or be liable for costs or damages awarded in any suit or proceeding for patent infringement resulting from the use of any other products, or any completed equipment, system, assembly, combination, method or process furnished, used or specified by Buyer or others.

b. In the event of a claim of infringement, Seller shall, at its expense and option:

   i. Procure for the Buyer the right to continue using the Goods;

   ii. Promptly replace the Goods with non-infringing Goods that have substantially the same function as the Goods; or

   iii. Promptly modify the Goods so as to maintain functionality but to remove the alleged infringement.

c. If, in connection with any claim of infringement, Seller directs Buyer in writing to cease use of the Goods, Buyer shall be entitled to repayment of a portion of the Purchase Price and if Buyer fails to cease its use of the Goods pursuant to Seller's direction, then Seller shall have no obligation to pay such damages and costs that apply to any alleged infringement occurring after Seller has directed Buyer to cease use of the Goods.

d. Seller's duties under this Section are conditioned upon Buyer notifying Seller in writing, within ten (10) days of Buyer's knowledge of any such claim, furnishing to Seller a copy of each communication relating to the alleged infringement, and giving Seller all authority (including the right to exclusive control of the defense and settlement of any such suit or proceeding), information and assistance (at Seller's expense) necessary to defend or settle such suit or proceeding.

e. Seller shall not be obligated to defend any suit or proceeding, or be liable for any costs or damages, if the infringement arises out of compliance with Buyer's Specifications or any marking or branding applied at the request of Buyer. Buyer agrees, at its expense, to defend and to pay costs and damages finally awarded in any suit or proceeding against Seller based on any such infringement, provided that Buyer is promptly notified by Seller in writing of the commencement or threat of such suit or proceeding or claim of infringement and is given all authority (including the right to exclusive control of the defense of any such suit or proceeding), information and assistance (at Buyer's expense) necessary to defend or settle such suit or proceeding.

f. Seller shall indemnify, defend and hold Buyer harmless from and against any and all expenses, losses, costs, claims, demands, causes of action, and damages of whatever kind, which result from personal injuries to a third party to the extent occurring (i) at the Worksite during the installation or testing of the Goods and which are due to the gross negligence or willful misconduct of Seller or its employees or subcontractors, or (ii) as a result of the use of the Goods for their intended purpose if operated, maintained and used pursuant to Seller's instructions to  Buyer, excluding, however, application of the Goods in a manner required by Buyer Specifications. Buyer shall indemnify, defend, and hold Seller harmless from and against any and all expenses, losses, claims, demands, causes of action, and damages of whatever kind which result from the negligent use or operation or the willful misuse of the Goods by any person other than Seller or Seller's employees or contractors in a manner other than in the manner in which the Goods are intended to be used, or which result from the removal or modification of safety features unless Buyer notifies Seller and such modification is approved by Seller.

14. **SEVERANCE**. Any provision hereof which is declared invalid in any jurisdiction by any tribunal will, as to such jurisdiction, will, without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, automatically be revised to the minimum extent necessary to satisfy the requirements for validity as declared at such time in a manner calculated to lead to the same economic effect as the original terms of the Agreement and, so adjusted, shall be deemed a provision of the Agreement as though originally included herein. In the event that an invalidated provision is of such a nature that it cannot be so revised, the provision shall be deemed deleted from the Agreement. In either case, the remaining provisions in the Agreement shall remain in effect.

15. **GOVERNING LAW, VENUE, AND WAIVER OF RIGHT TO JURY TRIAL**. These Terms and the Agreement shall be governed and construed in accordance with the laws of the State of Arkansas, U.S.A., excluding (i) its conflict of laws provisions and (ii) the United Nations Convention for the International Sale of Goods. Buyer hereby consents to the sole jurisdiction of the state and federal courts sitting in Craighead County, Arkansas, and Buyer agrees not to raise, and hereby waives, any defenses based upon venue, inconvenience of forum, lack of personal jurisdiction, improper service of process or the like in any such action or suit.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUYER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR COUNTERCLAIM ARISING UNDER OR IN ANY WAY RELATED TO THESE TERMS AND CONDITIONS OR THE SALE OR PROVISION OF THE WORK HEREUNDER UNDER ANY THEORY OF LAW OR EQUITY, WHETHER NOW EXISTING OR HEREAFTER ARISING.

16. **CHANGES**. Buyer may, at any time, request changes or additions within the general scope of the Agreement for consideration by Seller. If any such change causes any increase or decrease in the cost or schedule, Seller shall notify Buyer in writing and an appropriate equitable adjustment will be made in the price or time of performance, or both, by written modification of the Agreement. Any claim by Seller for such adjustment must be asserted within 60 days, or such other period as may be agreed upon in writing by the parties, after Seller's receipt of notice of the change. Actions or inactions by Buyer constituting a constructive change in Seller's performance hereunder shall be a "change" for purposes of this clause. Seller shall not be required to proceed with a change order unless agreed upon in writing by a duly authorized representative of the Buyer and Seller.

17. **ASSIGNMENT/SUBCONTRACTS :**  Buyer shall not delegate the performance of any obligation hereunder, nor assign any rights arising under the Agreement, to any third person without the prior written consent of Seller.  Seller may assign any of its rights or delegate any of its duties pursuant to the Agreement and/or assign the entire Agreement to any subsidiary, affiliate, division, successor or acquirer of Seller, without the consent of Buyer.  Seller reserves the right to use subcontractors in the performance of any services to be performed by Seller.



18. **NOTICES**. All notices, requests, demands and other communications under the Agreement shall be in writing and delivered (including delivery by electronic mail, first-class mail, courier or other similar means) to the address where the party being notified normally carries on business. Notice will be effective on the date that it is delivered or, if sent by first-class mail, on the fifth business day after the day of mailing. All notices to Seller shall be addressed to its President, with a copy to its Chief Financial Officer.

19. **FORCE MAJEURE**. Except for payment obligations, neither party shall be liable for any delays in the performance of any of its obligations hereunder, nor be deemed to have defaulted under these Terms or the Agreement, due to causes beyond its reasonable control, including, but not limited to: (i) acts of God; (ii) flood, fire, earthquake or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (iv) applicable laws, regulations and other governing authorities; (v) actions, embargoes or blockades; (vi) action by any governmental authority; (vii) national or regional emergency, including without limitation pandemics, epidemics or quarantine restrictions such as those implemented in connection with COVID-19 (a.k.a. corona virus); (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) shortage of adequate power or transportation facilities; (x) unavailability or shortages of materials or equipment, failures; or (xi) delays in delivery of vendors and suppliers.

20. **NO WAIVER**. The waiver of a breach or default under the Agreement shall not be interpreted to constitute waiver of any subsequent breach or default, and shall not act to amend or negate the rights of the parties hereto.

21. **INDEPENDENT CONTRACTORS**. The parties are independent contractors of one another. Nothing herein shall be deemed to create any relationship of agency, partnership, or joint venture between the parties.

22. **ENTIRE AGREEMENT**. The Agreement, these Terms, and Seller's Proposal represent the entire agreement between the parties with respect to the Work, and supersedes all prior agreements (whether written or oral), negotiations, understandings and commitments.  These terms and conditions shall not be modified, except by written agreement signed by both of the parties hereto.

23. **AUTHORITY**. S&H and Customer each hereby represent and warrant that they have the full power and authority to enter into the Sales Agreement and to perform their obligations thereunder and hereunder. Each party warrants that they have taken all necessary action on their part, corporate or otherwise, to authorize the execution of the Sales Agreement.



# Purchase Order

P.O. Box 1414
Paragould AR 72451
United States
financials@fidusglobal.com

PO Number: 31427
Issue Date:10/6/2025

**Supplier:**
S&H Systems, Inc.
P.O. Box 2946
Jonesboro AR 72402
United States

**Supplier Phone:**

**Ship to:**
Remote
United States

**Comments and Special Instructions:**

| Purchase Order Contact: | Shipping Method: | Shipping Terms: |
|---|---|---|
| Mark Phillips | | |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| **Vendor Services** 50% Downpayment to kick off Engineering and order hardware - Due Net 30 | 1 | $122,549.50 | $122,549.50 |
| **Vendor Services** 25% Delivery of Conveyor to JCP Distribution Center - Due Net 45 | 1 | $61,274.75 | $61,274.75 |
| **Vendor Services** 20% Completion of Mechanical Installation - Due Net 45 | 1 | $49,019.80 | $49,019.80 |
| **Vendor Services** Fidus Final Acceptance - Due Net 45 | 1 | $12,254.95 | $12,254.95 |
| **Vendor Services** This PCN Total Adjustment to Contract Price | 1 | $9,423.00 | $9,423.00 |

| Payment Terms: | **Total** | $254,522.00 |
|---|---|---|

All invoices must reference PO#
SEND INVOICES TO: AP@fidusglobal.com
If you have any questions about this purchase order, please contact us at AP@fidusglobal.com or 877-705-0301

**EXHIBIT**

**B**

exhibitsticker.com

Created via Punchout:

No